<pre>
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA
 2
                                     )
 3    UNITED STATES OF AMERICA,       )   21-cr-00281-1
                                      )
 4                     Plaintiff,     )   Easton, PA
                                      )   March 23, 2023
 5    vs.                             )   2:06 PM
                                      )
 6    ANTHONY DOUGLAS ELONIS,         )
                                      )
 7                     Defendant.     )


 8
                      TRANSCRIPT OF SENTENCING HEARING
 9                BEFORE THE HONORABLE EDWARD G. SMITH
                      UNITED STATES DISTRICT JUDGE
10
      APPEARANCES:
11
      For the Plaintiff:        ROBERT J. O'HARA, ESQ.
12                              UNITED STATES ATTORNEY'S OFFICE -
                                EDPA
13                              615 Chestnut Street
                                Suite 1250
14                              Philadelphia, PA 19106

15    For the Defendant:        EDSON A. BOSTIC, ESQ.
                                THE BOSTIC LAW FIRM
16                              1700 Market Street
                                Suite 1005
17                              Philadelphia, PA 19103

18                              JARED WITMIER, FBI
                                SHERRI STEPHAN, AUSA
19    Also present:

20    ECR OPERATOR:             JENNIFER FITZKO

21    Proceedings recorded by electronic sound recording.

22                              Carol Folk
                                eScribers
23                          7227 North 16th Street
                                Suite #207
24                          Phoenix, AZ 85020
                              (800) 257-0885
25
</pre>

1                          I N D E X

2   EXHIBITS:  DESCRIPTION                          ID.   EVID.
    For the Plaintiff:
3   P-1          Victim impact statement                   38
    For the Defendant:
4   D-1          Psychologist report and evaluation,       33
                 letter from Paul Horninger, article
5   D-2          Certificates of course completion         34

6

    CLOSING ARGUMENTS:                                     PAGE
7   For the Plaintiff                                        38
    For the Defendant                                        44
8

9   RULINGS:                                        PAGE  LINE
    Court denies defendant's motion for              7      6
10  judgment/new trial (Doc. 91)

11  Court imposes sentence of 151 months,            58     25
    $300 special assessment, and three-year
12  supervised release upon completion of
    imprisonment

13

14

15

16

17

18

19

20

21

22

23

24

25

www.escribers.net | 800-257-0885

Colloquy

1          THE CLERK:  All rise.  United States District Court is

2     now in session.  The Honorable Edward G. Smith presiding.

3          THE COURT:  You may be seated.  Thank you.

4          The Court is called to order in the matter of the

5     United States of America v. Anthony Douglas Elonis.  This is

6     criminal action number 21 TAC 281.  Present in the courtroom is

7     the defendant, Mr. Elonis.

8          Good afternoon, sir.

9          THE DEFENDANT:  Good afternoon.

10         THE COURT:  And he's being assisted by his counsel,

11    Attorney Edson Bostic.  Mr. Bostic --

12         MR. EDSON BOSTIC:  Good afternoon, Your Honor.

13         THE COURT:  Good afternoon, sir.

14         And on behalf of the United States appears Assistant

15    United States Attorney Robert O'Hara.

16         MR. ROBERT O'HARA:  Good afternoon, Your Honor.

17         THE COURT:  Good afternoon, sir.

18         And Jared Witmier from the Federal Bureau of

19    Investigation.  Good afternoon.

20         MR. JARED WITMIER:  Good afternoon, Your Honor.

21         THE COURT:  Mr. Elonis, the Court convenes today for a

22    sentencing hearing.  You have previously been convicted by a

23    jury of three counts of cyberstalking.  Sir, are you prepared

24    to proceed to sentencing?

25         THE DEFENDANT:  Yes.

escribers
www.escribers.net | 800-257-0885

Colloquy

1        THE COURT:  Very well.  If you would please stand and

2   raise your right hand to be sworn.

3             DEFENDANT, ANTHONY DOUGLAS ELONIS, SWORN

4        THE COURT:  Thank you very much, sir.  You may be

5   seated.

6        And before we proceed to the formal sentencing

7   proceeding, we do need to address the defendant's motion for

8   judgment of acquittal or, in the alternative, for a new trial.

9   I have received both the defendant's motion and memorandum of

10  law, as well as the Government's response to the motion.

11       Mr. Bostic, would you like to be heard further with

12  respect to your motion for judgment of acquittal or for a new

13  trial?

14       MR. BOSTIC:  Your Honor, we would rest on the

15  submission.  I think we wrote a lot about the issues, and we

16  will not add to it at this point.  Thank you.

17       THE COURT:  Very well, sir.

18       Assistant United States Attorney O'Hara, would you

19  like to be heard?

20       MR. O'HARA:  I agree, Your Honor.  We filed an

21  extensive brief on both the Rule 29 and the Rule 33 standard.

22  We've summarized -- tried to briefly summarize the evidence,

23  and we believe that neither the motion for judgment of

24  acquittal or the motion for a new trial has merit.

25       THE COURT:  Very well.

escribers
www.escribers.net | 800-257-0885

Colloquy

1    MR. O'HARA:  And we rest on the filings.  Thank you.

2    THE COURT:  Thank you.

3    And I do commend both counsel for addressing these

4    issues, as they were addressed at trial.  The issues with

5    respect to the evidence that was going to come in under 404(b)

6    was addressed extensively at trial and pretrial, as were the

7    legal issues related to these particular charges.  And what I

8    mean by that is the relationship between what is a true threat

9    versus what is constitutionally protected threat, and whether

10   the evidence at trial was sufficient to meet that.

11   The interesting thing about this is the facts that

12   were alleged in the indictment were almost uniformly agreed to

13   by Mr. Elonis.  So the issues in this case as far as the facts

14   and what happened were not really contested.  What was really

15   contested, I believe in Mr. Elonis' mind, was whether he had

16   the constitutional right under the First Amendment to make

17   these communications.  And by that I mean did he have the

18   intent to intimidate -- well, to make me very concise about

19   it -- did he have the intent to put his victims in fear of

20   bodily harm or death.

21   So with respect to these motions, these are very much

22   what we've already addressed throughout the trial.  As both of

23   you know, the Rule 21 motion requires that I review the record

24   in light most favorable to the prosecution to determine whether

25   any rational trier of fact could've found proof of guilt beyond

escribers
www.escribers.net | 800-257-0885

Colloquy

1    a reasonable doubt based on the available evidence.  And again,

2    this is a very highly deferential standard.  The defendant is

3    seeking relief under Rule 29 bears a very heavy burden.

4            With respect to motions for a new trial, the trial

5    court has discretion as to whether to grant a new trial.  But

6    here again, unlike situations where I'm reviewing the

7    sufficiency of the evidence, when a district court evaluates a

8    Rule 33 motion it does not view the evidence favorably of the

9    Government, but instead exercises its own judgment in assessing

10   the Government's case.  However, even if a district court

11   believes that a jury verdict is contrary to the weight of the

12   evidence, it can order a new trial only if it believes that

13   there is a serious danger that a miscarriage of justice has

14   occurred -- that is, that an innocent person has been

15   convicted.  And such motions are not favored and should be

16   granted sparingly and only in exceptional cases.

17           I'm not going to go through all the evidence that was

18   presented at trial.  What I will say is that Mr. Elonis has

19   failed to meet his burden in this case.  The Government

20   presented sufficient evidence that a reasonable juror could

21   find that he sent the messages with the intent to create a fear

22   of harm in the three victims.  That is a fear of bodily injury

23   or death.

24           Further, the Court found that the prior bad acts and

25   the order of Facebook posts were intrinsic evidence and should

escribers
www.escribers.net | 800-257-0885

Colloquy

 1  be admissible.  And to the degree any of the objectionable

 2  evidence was extrinsic, it went to motive and intent and should

 3  be admitted under Federal Rules of Evidence 403 and 404(b).

 4  Mr. Elonis has presented no evidence or case law that calls

 5  these decisions into question.

 6          Therefore, I am going to deny his motion for judgment

 7  of acquittal and deny his motion for a new trial.  And I

 8  incorporate the rulings that I've previously made throughout

 9  the course of these proceedings, but with pretrial and during

10  trial.

11          Is the ruling of the Court clear?

12          MR. BOSTIC:  From the defense perspective, yes, Your

13  Honor.

14          MR. O'HARA:  Yes, Your Honor.

15          THE COURT:  Very well.  Then moving on to the formal

16  sentencing hearing, at the time, Mr. Elonis, that the jury

17  verdict was accepted and entered, I noted the applicability of

18  the Sentencing Reform Act, and I directed that a presentence

19  report be prepared.  That report has been prepared, and I have

20  received it and I have read it.

21          I've also received the Government's memorandum of law

22  regarding objections to the presentence investigation report.

23  I've received the defendant's response to the Government's

24  objections.  I received the defendant's motion for variance and

25  sentencing memorandum.  I received as part of that the report

escribers
www.escribers.net | 800-257-0885

1   and psychological evaluation of Dr. Thomas F. Hayworth, who's a

2   licensed psychologist.  Also attached thereto was the letter of

3   your uncle, Robert Horninger (ph.).  And there was an article,

4   which I'll refer to as "New Directions in Childhood Abuse and

5   Neglect".

6          Are there any other items that I should be -- have

7   before me?

8          MR. O'HARA:  Not from the Government, Your Honor.

9          MR. BOSTIC:  Not from the defense either, Your Honor.

10          THE COURT:  And Mr. Bostic, have you had an

11   opportunity to review all these documents and discuss the

12   presentence report with Mr. Elonis on a timely basis?

13          MR. BOSTIC:  Yes, I have, Your Honor.

14          THE COURT:  Very well.

15          Now, as it stands, the presentence report shows a

16   total offense level of 29, and in light of seven criminal

17   history points, a criminal history category of IV, which would

18   result in a guideline range of 121 to 151 months.  And I've

19   received objections from both the Government and the defense

20   with respect to the probation officer's calculation of the

21   guidelines.

22          And I'll address the Government's first, which is

23   whether there should be a two-level obstruction of justice

24   enhancement under Section 3C1.1 of the guidelines based on the

25   fact that Mr. Elonis testified at trial and, in the opinion of

Colloquy

1    the Government, he willfully attempted to obstruct justice

2    through his testimony.

3            Assistant United States Attorney O'Hara, do you wish

4    to be heard?

5            MR. O'HARA:  I do, Your Honor.

6            THE COURT:  You may proceed, sir.

7            MR. O'HARA:  With the Court's permission, Your Honor.

8    Thank you.

9            Judge, we filed an objection and we did file a

10   memorandum of law --

11           THE COURT:  Yes.

12           MR. O'HARA:  -- in support of our objection which the

13   Court has seen.  And the Government believes that specifically,

14   we're objecting to paragraphs 60, 69, 75, and 81 of the PSR.

15   The Government asserts that a two-level obstruction of justice

16   enhancement under 3C1.1 of the guidelines applies to each count

17   of conviction in the present matter.  And the Court is familiar

18   with that guideline -- 3C1.1.  The application notes indicate

19   that it is warranted for committing, suborning, or attempting

20   to suborn, perjury, and/or for providing materially false

21   information to a judge or magistrate judge.

22           Now, it is well established, Judge, that while the

23   defendant has a right to testify, that does not include the

24   right to commit perjury.  That's the Dunnigan case out of the

25   Supreme Court.  And the defendant qualifies for the perjury

Colloquy

1    enhancement when he gives false testimony concerning a material

2    matter with willful intent to provide such testimony, rather

3    than as a result of confusion or mistake or faulty memory.

4         And Judge, you hit the nail on the head when you said

5    during the trial there wasn't much dispute during Mr. Elonis'

6    testimony that he sent the letters that were at issue, the text

7    messages that were at issue, the emails that were at issue,

8    phone calls, voicemails, all of those types of communications.

9    What was at issue and what is material to the case is the

10   defendant's intent.  Did he have the intent to put people in

11   fear of bodily injury or death?  Did he intend that these

12   things be seen by his victims?  Did he intend that these be

13   taken as -- these communications be taken as threats, or did he

14   know that they would at least be viewed as threats by his

15   victims?

16        And we set forth in our memorandum, Your Honor, going

17   through the transcript a number of the places in the testimony

18   and -- not all in there -- but I think there's kind of a

19   representative sample.  Mr. Elonis sat on the stand on the

20   questioning from defense counsel, went through the

21   indictment -- not line-by-line -- but went through many of the

22   communications which were set forth in the indictment

23   particularly regarding the three victims, Victim 1, Victim 2,

24   Victim 3.  He was asked repeatedly, did you have any intent to

25   communicate a threat?  No.  And then sometimes he would offer

Colloquy

1   an explanation to the jury as to why he made that posting or

2   why he sent that email.

3        On page 6 of my memorandum, he was questioned by

4   counsel about the sexually explicit email that he sent to the

5   assistant U.S. attorney, Victim number 1.  Did you have any --

6   did you have any intent to communicate a threat?  No.  He then

7   went on to explain that the email was, quote, "An ill advised

8   way of announcing his support for a recent Texas statute" that

9   prohibited the unsolicited sending of sexually explicit

10  photographs.

11       He was asked regarding some of the other

12  communications.  There was the quote regarding hell hath no

13  fury like a crazy man in a kindergarten class.  It was not my

14  intent to communicate a threat.  It was not my intent to

15  threaten.  Did you intend in this statement to threaten Victim

16  number 1 with death or bodily injury?  No.  Was that sent to

17  communicate a threat?  No.  Did you intend to communicate a

18  threat of death or bodily injury?  No, there were no threats of

19  any kind; there were no threats of bodily injury.  He just

20  repeated that throughout his testimony.

21       Then he was asked about some of the tweets that were

22  posted on Twitter, and one of the issues was, was it intent

23  that the victims -- that his victims would see these tweets.

24  The question, was it in your -- was it your intent that either

25  Victim number 1 or 2 or 3 see them, meaning the tweets.  His

Colloquy

1    answer was, no.  He provided these responses knowing full well

2    that his tweets were observed on Twitter by his victims or his

3    intended audience.

4          A voicemail to Victim number 3, his ex-wife, he

5    indicated that he knew that she was reading his Twitter

6    posts -- the Court recalls that voicemail -- I'm not stupid, I

7    know you read my stuff, I know Victim Number 2 reads my stuff,

8    I know another ex-girlfriend reads my stuff.

9          In a separate voicemail, he apologized to his ex-wife

10    for the things that he placed the -- he put up on Twitter.

11    "I'm sorry for all those things I said, these dreadful things I

12    said about you, I deleted them".  So he knows full well that

13    his victims were seeing these posts.

14          He went further, though.  He went further.  He said,

15    "No, these weren't intended" -- "These weren't intended to

16    scare anyone.  These were intended for my First Amendment

17    community.  I was writing to law professors, to my audience on

18    Twitter.  I mean, my audience consisted of law professors and

19    law students.  Victims number 1, 2, and 3 were not part of my

20    audience".

21          Question, "So when you posted all your tweets or

22    Facebook posts, your testimony was that your intended target

23    was the First Amendment community?"  Answer, yes.

24          Now, Judge, we cited some cases in our brief, and the

25    buzzword from the cases is irreconcilably inconsistent with the

escribers
www.escribers.net | 800-257-0885

Colloquy

1    jury's verdict.  The defendant's testimony and explanations

2    were irreconcilably inconsistent with the jury's verdict.  The

3    Court instructed the jury as to intent, both in the closing of

4    a charge to the jury and at other points in the trial.

5             As there are some cases in the Third Circuit, for

6    instance, in a gun case, possession of a firearms case,

7    defendant takes the stand.  He's found guilty by the jury of

8    possessing a gun.  Necessarily, the jury had to disbelieve his

9    testimony regarding a material fact for them to find him

10   guilty.  The jury believed that that defendant -- I believe

11   it's the Johnson case -- didn't have a gun, they would've found

12   him not guilty.  Similarly, there's a drug case.  Defendant

13   says no, I didn't possess drugs.  Jury finds him guilty of

14   possession of the drugs.  Irreconcilably inconsistent.

15            We submit that there's no difference between the gun

16   incident or the drug incident and the intent issue which is

17   before this Court and which was before this jury.  If the jury

18   believed Mr. Elonis, that he did not intend to put anyone in

19   fear, bodily harm, death or that he did not intend these things

20   as threats or that he did not intend his victims to see these

21   things, I don't think we'd be standing here today.

22            His testimony is irreconcilably -- what is the

23   buzzword again?  I keep --

24            THE COURT:  Inconsistent.

25            MR. O'HARA:  Irreconcilably inconsistent -- that's

Colloquy

1    hard to say -- with the jury's finding.

2         Now, there are two cases -- not in our circuit but out

3    of another circuit that I think are directly on point, and

4    they're very similar in fact to the situation that we have

5    here.  And one is the Floyd case.  And in Floyd, which I

6    believe is sixth -- I don't recall the -- it's either the sixth

7    or the eighth, Judge.  But a defendant in the case sent -- it's

8    the Eighth Circuit, 2006.  The defendant sent copies of an

9    article about the murder of a federal judge's family.  He sent

10   copies of the article to a lawyer, the two judges, and to a

11   district judge in Iowa who had had some dealings with the

12   defendant's family in various litigation.

13        And on top of the article, the defendant wrote the

14   words, quote, "Be aware be fair".  The defendant -- like Mr.

15   Elonis at trial -- the defendant admitted, yes, I sent the

16   letters, but she denied that the letters were meant to threaten

17   or intimidate the recipient.  And the defendant was found

18   guilty at trial by the jury of making threats under 876(c).

19        The district court found the obstruction enhancement

20   applied -- applied -- because the defendant had perjured

21   herself when she said that the communications were sent for a

22   reason other than to threaten.  Just like Mr. Elonis said, I

23   was posting this stuff for my First Amendment community; it

24   wasn't meant to threaten anybody.  The district court found the

25   statements were perjured statements about a material issue or

Colloquy

1   intent and not as a result of mistake or faulty memory.  The

2   Eighth Circuit affirmed the obstruction enhancement.

3           In another Eighth Circuit case, Mabie -- M-A-B-I-E --

4   again, the defendant was charged with mailing threatening

5   communications and one count of interstate threats.  At trial

6   he took the stand in his own defense.  He testified that he did

7   not intend to harm anyone, just like Mr. Elonis did.  Rather,

8   he claimed he had some legitimate reason for sending or posting

9   these communications.  The defendant was convicted on all four

10  counts.  The district court found that he testified falsely

11  regarding his motives for making the threatening

12  communications, and they assessed a two-level enhancement for

13  obstruction of justice.  The Eighth Circuit affirmed that --

14  affirmed the obstruction enhancement -- on each of the four

15  counts, finding ample proof that Mabie made his communications

16  for reasons other than he declared at trial.

17          So I think we've got the very similar, analogous

18  situation where Mr. Elonis is testifying as to his intent and

19  his motive, and he's misleading the jury as to his intent and

20  his motive.  Had the jury believed him, we wouldn't be here.

21  Again, it just doesn't match with the jury's verdict.  They

22  have made that finding of materiality and, we submit, falsity.

23  It's implicit in their verdict.  They had to find that he had

24  the intent.  They did make that finding.

25          So Judge, I think to circle back, it's no different

escribers
www.escribers.net | 800-257-0885

Colloquy

1   than a defendant in a possession of a gun case saying, I didn't

2   have a gun.  It's no different than a defendant in a bank

3   robbery case saying, I didn't rob the bank.  It's no different

4   than a defendant in a drug case saying, no, those weren't my

5   drugs, those belong to someone else.  It's perjury regarding a

6   material fact and a crucial fact that the jury has to find, and

7   it's necessarily implicit in this particular jury's verdict.

8           Now, the Supreme Court has said under Dunnigan that

9   the perjury adjustment is mandatory if the court believes the

10  defendant has committed perjury at trial, and the court has to

11  make findings that he did willfully obstruct justice, and we

12  believe he did and we believe it applies in this case.

13          Thank you, Your Honor.  Thank you for consider --

14          THE COURT:  Thank you very much, sir.

15          MR. O'HARA:  Thank you for your consideration of our

16  motion.

17          THE COURT:  Thank you, sir.

18          Mr. Bostic, would you like to respond, sir?

19          MR. BOSTIC:  Just briefly, Your Honor.  As I said, we

20  wrote a lot in this case, so I'm not going to be long.

21          But I beg to differ with the Government when they say

22  this case is just like all the other cases he cited.  If you

23  take the drug case and -- was about an individual who, as I

24  recall -- I believe it was Stenson -- where the person and his

25  friend were caught in the car by police officers and certain

escribers
www.escribers.net | 800-257-0885

Colloquy

1   items were recovered from the coat that that individual was

2   wearing.  He denied wearing the coat when he testified, or that

3   it was even his.  The female in the car also talked about some

4   evidence that he said wasn't his -- her home, as well as the --

5   I think it was a deputy marshal that made the arrest -- talked

6   about arresting this person with the coat on in the car -- in

7   the taxi.  Very different.  So too was the gun case in which

8   you have a defendant contesting the testimony of a police

9   officer who said he saw him pull the weapon from his waistband

10  and throw it on the car.  The weapon was recovered from on --

11  under the car.

12        What we have here -- and even with respect to -- I

13  think it's Mabie, the case last cited by the Government out of

14  the Eighth Circuit -- there you have a defendant testifying

15  about messages that were sent and claiming that he sent the

16  messages to stop another crime from being committed, and that

17  was his purpose.

18        Here, Mr. Elonis' testimony at trial was centered upon

19  his understanding and his perception of what constituted a

20  threat or a true threat under the First Amendment.  And even at

21  the time of trial -- and it's noted in my submission to the

22  Court -- the Government even made an objection to the fact that

23  Mr. Elonis was more or less reciting a not guilty as in terms

24  of an arraignment, as he testified as they went through each

25  count in the indictment.

www.escribers.net | 800-257-0885

Colloquy

1    Again, like all the cases that the Government cited,

2    Mr. Elonis got on the stand and admitted all the salient facts.

3    The only issue was how did he perceive what he was doing at the

4    time?  And I suggest to the Court that we would run afoul of

5    the law in this circuit and the Supreme Court case with respect

6    to when this enhancement should be -- would be appropriate.

7    Dunnigan talks about it shouldn't be applied merely because a

8    person is contesting his guilt by denial that he is guilty of

9    the offense.

10    But equally important here, we have to put ourselves

11    in the shoes of Mr. Elonis as he's testifying because to impose

12    this enhancement, it has to be willful, it has to be

13    intentional, and I reference this in my submission to the Court

14    on this point.  And it's clear that throughout -- probably from

15    about his teen years age, Mr. Elonis has been living under

16    bipolar disorder, which has not been successfully or

17    consistently treated.  In the report that we submitted to the

18    Court as part of our sentencing memorandum, Dr. Hayworth states

19    that this disease causes grandiose thought processes and as

20    well as some delusional thought processes.

21    Fast-forward to his testimony.  Everything that he

22    tried to convey to the jury was about his perception of what he

23    did and what it meant consistent with his understanding of the

24    First Amendment.  And I would suggest to the Court that even at

25    the level of a preponderance of the evidence, the Government

Colloquy

1    has not carried its burden in this case for the application of

2    the 3C1.1 enhancement for perjury.  We need something more and

3    when it's linked in to the intent as he expressed it in trying

4    to explain to the jury his understanding of the First Amendment

5    and what it meant, it should not be applied here.

6            There's an exchange between the Court, the defense

7    counsel at the time, and the Government attorney about the

8    notion that the law that he's saying may not be correct, and

9    this Court assured the parties that, I will take care of that

10   at the time during my instruction because the law comes from

11   me, not from anyone on the stand, in essence.  And that's what

12   we here, and the Court did, in fact, during the course of this

13   trial at many times, particularly shortly after that exchange

14   was had -- the Court went in again and explained the law of

15   intent.

16           So I suggest to the Court this is not the appropriate

17   case for the application of the enhancement under 3C-1.1.

18           Thank you, Your Honor.

19           THE COURT:  And Assistant United States Attorney

20   O'Hara, anything else?

21           MR. O'HARA:  Judge, I think defense counsel described

22   the Floyd case to a T, to a T.  It's the sole issue the

23   defendant in that case testified about, he admitted to sending

24   all the letters.  He admitted to sending all the

25   correspondence.  She denied -- she denied -- that the letters

www.escribers.net | 800-257-0885

Colloquy

```
1    were meant to threaten or intimidate anyone.  Just like this
2    jury so found our defendant, Mr. Elonis, they had a find that
3    he intended to threaten, that he obstructed regarding the
4    critical element in the case.  By the time he took the stand he
5    wasn't -- he couldn't take the stand and denies it.  Nor the
6    things that Government had approved, Judge, that he's the
7    person that sent the communications, right?  We have to
8    identify him as the person.
9         After the Government rested its case after all the
10   witnesses testified, after witness after witness testified
11   about things that only Mr. Elonis they knew about; after porn
12   pics were sent of his girlfriend that only he had after IP
13   addresses come back to his residence; after he admitted to
14   marshals way back in 2013 to sending those letters and writing
15   those letters; after the Government rests its case and after
16   demur, he then takes the stand and says, well, yes, I'm the
17   person that sent those communications.  What was he going to
18   say?  What was he going to say?  At that point it was proven --
19   he had survived demur -- it was proven that he was the person
20   who submitted the communications.  He doesn't get some benefit
21   from that.  We had proven that.
22        What he does is try to mislead the jury as to the
23   critical question and the critical issue in the case -- or
24   issues -- his motive and his intent, and that's what he did.
25   Whether or not he has bipolar disorder has nothing to do with
```

Colloquy

1   whether he obstructed justice and gets an enhancement under

2   3C1.1.  What defense counsel has described, I think, Judge, was

3   the exact situation in Floyd.  In that case, the Eighth Circuit

4   found that the obstruction enhancement applied to each count

5   involving each victim in the case.

6           Thank you.

7           THE COURT:  Thank you very much, sir.

8           I must say that you are both right.  I must also say

9   that the probation officer was remarkably insightful in not

10  applying this enhancement to this unique case.  There's no

11  question that we're focused on intent.  There's no question

12  that this issue of true threats and the jurisprudence, both

13  Supreme Court and appellate court -- jurisprudence has been

14  developing and still has not been fully resolved by any means.

15  But it's all about intent because the First Amendment is so

16  important.  And yet these victims had every right not to be

17  threatened and put in fear of death or bodily harm.  So the

18  question is where do you draw the line?

19          Now, in order to apply this enhancement, one, I could

20  easily say, he took the stand and he was deliberately and

21  willfully misrepresenting his intent, and then I could apply

22  the enhancement.  To do that, though, I would have to first

23  analyze what is it about Mr. Elonis that he's engaged in this

24  pattern of activity that is almost inexplicable --

25  inexplicable.  He's already been sentenced for communicating

escribers
www.escribers.net | 800-257-0885

Colloquy

1    threats, and he spends forty-four months in jail for that.  And

2    yet despite that, while he's still finishing that term, he

3    begins making more threats.  It's inexplicable.  So he must

4    have a plan, according to the Government.  It would really --

5    you really need a plan.  His plan is, I'm an expert in the

6    jurisprudence of true threats; I think I know what is and what

7    is not, in other words, what I can get away with and avoid

8    conviction.

9          Now, the question is did his plan include carefully

10   tailoring his threats -- because if so, it was very poorly

11   done -- or did his plan also include that extra step that if I

12   am indicted, I will go to the jury trial -- which he has every

13   right to do -- I will take the stand, there'll be no other

14   evidence on intent, and I'll lie about my intent to try to

15   conform it within the jurisprudence of what is a true threat to

16   try to avoid conviction.  That's taking a big chance, as he's

17   found out.  That's taking a big chance.

18         But then again, look who we're dealing with.  We are

19   not dealing with a genius in the law.  We're not even dealing

20   with someone who's trained in the law.  And where the most

21   profound evidence comes in is, in fact, from the psychologist's

22   evaluation of him.  So Dr. Hayworth, when he talks about a

23   delusional belief that he has profound insights into what

24   behavior does and does not constitute a true threat within the

25   First Amendment -- he used "jurisdiction" but we'll -- I'll use

Colloquy

1   his term "jurisdiction" -- this case, the only way to explain

2   it is to accept that he does have some delusions about himself,

3   that he suddenly was the -- and I don't want to misstate

4   this -- an heir of martyrdom, accidental guardian of our

5   freedoms, driving his behavior off the rails.

6        I think everyone in this courtroom believes this is

7   true.  I don't think anyone having listened to Mr. Elonis take

8   the stand would disagree with the evaluation that was done by

9   the psychologist.  His mental illness certainly doesn't rise to

10  the level of a defense, but it must be considered in trying to

11  understand this criminal behavior that he engaged in, and that

12  the jury easily found he engaged in and easily found that his

13  intent -- now, we act as though it's the only intent -- that

14  his intent was to put these three victims in fear of death or

15  bodily injury.  He did put them in fear of death or bodily

16  injury.  He intended that.  But he intended to do it in a way

17  that would be legal in his own mind.  In his own mind, he

18  intended it.

19       So when he took the stand and said that that was his

20  intent, he almost had to lie then when he was faced with the

21  question -- the critical question -- did you intend to put the

22  victims in fear of death or bodily injury?  Answer, no.

23  Absolute lie.  Absolute lie.  There was no way the jury was

24  going to believe him because the jury was not delusional and

25  the jury was not under this idea that somebody would make these

escribers
www.escribers.net | 800-257-0885

Colloquy

1   kind of communications with a victim without intending to put

2   them in fear of death or bodily injury.  And the jury saw right

3   through it and the jury found, as the evidenced supported, a

4   conviction on these crimes.

5        But now for me to -- when we come to sentencing and we

6   understand all this, in recognizing how incredibly unacceptable

7   and criminal his behavior is and the impact it had on these

8   three victims -- on one she was actually a victim in his prior

9   case.  Now, two of them had a relationship with him, but

10  another one is a law enforcement officer.  The ones that had a

11  relationship with him at least knew him more, but that doesn't

12  necessarily mean you're less in fear, because you do know him

13  more.

14       But the other, because the relationship between a law

15  enforcement officer who has prosecuted you and a criminal who's

16  now served time in jail, starts making threats, he knew what he

17  was doing.  He knew he was trying to put them in fear of death

18  or bodily injury, but he also in his own mind thought he could

19  tailor it in such a way that he could somehow get out of it.

20       So the United States is absolutely correct.  He had to

21  lie on that most crucial issue in the trial for his plan to

22  succeed.  But I won't give him that type of genius ability that

23  he could come up with this plan and follow it all the way

24  through to his perjury -- I think when considering who we're

25  dealing with here -- and I think this is -- I don't want to say

escribers
www.escribers.net | 800-257-0885

Colloquy

1    anything negative about the probation officer; I think it's

2    completely positive -- the probation officer saw this and said,

3    number one, he had a right to go to trial even if it was part

4    of this plan.  He had a right to testify, and we're never going

5    to try unreasonably chill that.  He did not have a right to lie

6    in that right to testify.

7            But in balancing all of this with this particular

8    individual, given his psychiatric issues and psychological

9    issues, while it does not in any way detract from the

10   criminality of what he did or the wrongfulness of what he did,

11   to enhance his sentencing jeopardy arguably -- despite my

12   discretion of sentence outside the guidelines -- to enhance

13   that sentence in jeopardy by changing the guidelines by a two-

14   level enhancement, I think will be inappropriate in this

15   particular case.

16           So when I say both of you are right, you are right.

17   Could I impose that and would it stand up on appeal?

18   Absolutely.  Could I not impose it and it stand up on appeal?

19   Absolutely.  In this particular case, applying the burden I

20   must apply, I find that the probation officer was correct --

21   and brilliant, if I might say so -- in determining that this is

22   that one case where you've got it, but it should not be

23   applied.

24           So I'm going to overrule the Government's objection in

25   this -- with respect to that enhancement.

escribers
www.escribers.net | 800-257-0885

Colloquy

1    MR. O'HARA:  I thank the Court for its insight and for

2    its consideration, Your Honor.  Thank you.

3    THE COURT:  Certainly, sir.

4    And Mr. Bostic, you have three objections.  There were

5    four, I believe, but one has been resolved.  Would you like to

6    be heard with respect to your three objections, sir?

7    MR. BOSTIC:  No, Your Honor.  As I indicated in my

8    memo, we would rest on the submission and make no further

9    argument at this point.

10    THE COURT:  Very well.  And I don't want to -- and

11    Assistant United States Attorney O'Hara, would you like to be

12    heard?

13    MR. O'HARA:  Judge, I think the probation officer has

14    succinctly and accurately stated his reasoning as to why he

15    applied the particular guideline enhancements or guidelines

16    themselves that were applied in the case.  My argument would

17    probably be nothing more than to just to reiterate what the

18    probation office has said about those.  I don't think -- I

19    think it's objection 3 which has to do --

20    THE COURT:  The maximum period of ten years?

21    MR. O'HARA:  Right.  I don't think that affects the

22    guideline in any way as my understanding as to how the

23    guidelines are calculated.  It just goes to the statutory

24    maximum.  However, we agree with the probation officer's

25    assessment in that case that indeed it is a ten-year maximum.

Colloquy

1      THE COURT:  In light in the Assistant United States

2   Attorney's response, Mr. Bostic, anything further from you?

3      MR. BOSTIC:  No, Your Honor.  As I said, we rest on --

4   and I'm aware of the probation officer's response, and we rest

5   on our submission.

6      Thank you, Your Honor.

7      THE COURT:  Very well.  And this is one of the cases

8   where -- one of the many cases where the probation officer -- I

9   don't want to overstate how good a job he did in this

10  presentence report, but you gave him a lot to work with because

11  from the defense standpoint you had to challenge these because

12  they're so critical.  You had to challenge them, and they were

13  well challenged.  Because unfortunately, Mr. Elonis in his

14  conduct didn't give you much to work with because it was a

15  unique situation where he had previously been convicted of

16  these offenses -- just little facts in here.  One of the

17  victims is the exact same victim in both.  We've got a PFA in

18  place and then the timing of the PFA.  And then we've got

19  findings by the jury with respect to the PFA and the conduct.

20      And then we've got -- I don't want to keep overstating

21  that, but it -- so it put the defense in this difficult

22  position because these enhancements are significant.  But

23  they're significant because they address the very type of

24  conduct which rightfully should enhance a sentence.  So I do

25  find that the probation officer has addressed these very

Colloquy

1   effectively.

2          With respect to objection -- the defendant's first

3   objection, it's that the two-level enhancement under Section

4   2A6.2(b)(1) should not apply here.  And the probation officer

5   explained that he applied this enhancement under

6   2A6.2(b)(1)(E).  And I understand Mr. Bostic, you didn't -- you

7   weren't quite sure what subsection he was using, but it's a

8   pattern of activity involving stalking, threatening, harassing,

9   or assaulting the same victim results in a two-level increase.

10  The offense clearly involved the aggravating factor of being a

11  pattern of activity involving stalking, threatening, and

12  harassing the same victim -- that is Victim number 1.

13         It is noted that pursuant to Section 1B1.3 of the

14  guidelines, all relevant conduct is to be considered when

15  applying guideline enhancements.  And pursuant to Section

16  2A6.2, comment note 1, "'Pattern of activity involving

17  stalking, threatening, harassing, or assaulting the same

18  victim' means any combination of two or more separate instances

19  of stalking, threatening, harassing, or assaulting the same

20  victim, whether or not such conduct resulted in a conviction.

21  For example, a single instance of stalking accompanied by a

22  separate instance of threatening, harassing, or assaulting the

23  same victim constitutes a pattern of activity for purposes of

24  this guideline".

25         However, the conduct occurring in 2020 and containing

escribers
www.escribers.net | 800-257-0885

Colloquy

1    the indictment is enough to establish a pattern of behavior

2    between January 5th, 2020, and February 9th, 2020, the

3    defendant sent a total of eight emails to Victim number 1.

4    Finally, between January 5th, 2020, to December 11th, 2020, the

5    defendant posted nine Twitter posts referencing or naming

6    Victim number 1.  The relevant conduct involved conduct while

7    Elonis was still serving his prior federal prison sentence at

8    FCI Fort Dix, including two letters sent to Victim number 1

9    dated March 29th, 2013, and September 22nd, 2013.  As a pattern

10   has been established through charged conduct, as well as

11   through relevant conduct, together and standing alone, the

12   offense levels increase by two levels pursuant to Section

13   2A6.2(b)(1)(E).

14          And with respect to objection number 2, it's the four-

15   level enhancement under Section 2A6.2(b)(1), and that's at

16   paragraph 72.  And I don't want to just read this, per se, but

17   the enhancement under Section 2A6.2(b)(1)(A) for violation of a

18   court order -- that is the PFA -- and Section 2A6.2(b)(1)(E)

19   for a pattern of activity involving stalking, threatening,

20   harassing, or assaulting the same victim results in a four-

21   level increase.  It is noted that pursuant to Section 1B1.3,

22   all relevant conduct is to be considered.

23          And as we go all the way through here, we note that if

24   a defendant engaged in several acts of stalking the same victim

25   over a period of years, including acts that occurred prior to

escribers
www.escribers.net | 800-257-0885

Colloquy

1  the offense, then for purposes of determining whether

2  subsection (b)(1)(E) applies, the Court shall look to the

3  totality of the circumstances, considering only those prior

4  acts of stalking the victim that have a substantial and direct

5  connection to the offense.  As a pattern has been established

6  through charged conduct as well as through relevant conduct,

7  the offense level is increased by two levels pursuant to

8  Section 2A6.2(b)(1)(E).

9       The offense involved the aggravating factor of a

10  pattern of activity involving stalking, threatening, and

11  harassing the same victim -- that is, Victim number 2.  The

12  defendant's conduct was in violation of a court protection

13  order effective August 5th, 2019, to August 16, 2022.  After

14  the defendant's relationship with Victim number 2 ended in

15  2018, he began harassing Victim number 2 with text messages,

16  telephone calls, and voicemails.  In 2019, Elonis showed up at

17  Victim number 2's place of employment, followed her home, and

18  started banging on the windows of her car.  At other times, he

19  would show up at her home and bang on the windows of her

20  residence, demanding to be let into the residence.

21       In August 2019, Victim number 2 obtained a protection

22  or abuse order against Elonis in the Northampton County Court

23  of Common Pleas.  Despite the PFA, Elonis continued to contact

24  Victim number 2 by text, telephone, and voicemail.  Despite

25  being found guilty of indirect criminal contempt in October

Colloquy

1   2019 and fined, Elonis continued the harassment by posting a

2   revenge porn picture of Victim number 2 on Twitter.  He

3   continued to make additional posts about her or referencing her

4   and continued to contact her by text, telephone calls, and

5   voicemails.  Despite again being found guilty of indirect

6   criminal contempt and sentenced to prison, in December of 2020,

7   the defendant continued to make additional social media posts

8   referencing her.  Therefore, the offense levels increased by

9   four levels pursuant to Section 2A6.2(b)(1)(A) and (b)(1)(E).

10          And with respect to objection number 3 -- and this has

11  to do with the repeat offender ten-year maximum period -- the

12  defendant was charged and convicted of Section 2265A of Title

13  18 United States Code, which states, "Maximum Term of

14  Imprisonment.  The maximum terms of imprisonment for violation

15  of this chapter after a prior domestic violence or stalking

16  offense shall be twice the term provided under this chapter.

17  For purposes of this section, the term 'prior domestic violence

18  or stalking offense' means a conviction for an offense under

19  Section 2261, 2261A, or 2262 of this chapter or, as it applies

20  here, under state or tribal law for an offense consisting of

21  conduct that would have been an offense under a section

22  referred to in subsection (A) if the conduct had occurred

23  within the special maritime and territorial jurisdiction of the

24  United States or in interstate or foreign commerce".  And of

25  course, the term "state" includes Pennsylvania.

escribers
www.escribers.net | 800-257-0885

Colloquy

```
 1          The prior violation of a PFA is the predicate
 2   establishing the defendant as a repeat offender and is the
 3   reason it is contained in the indictment.  The jury was asked
 4   the following in relation to finding the defendant guilty of
 5   Count II.  Do you, the jury, unanimously find beyond a
 6   reasonable doubt that at some point during the commission of
 7   the offense, the defendant, Anthony Elonis, committed the crime
 8   of cyberstalking in violation of a temporary or permanent civil
 9   or criminal injunction, restraining order, no contact order, or
10   other protection order, to which the jury answered yes.  So I
11   do find that for purposes of Count II, the maximum sentence is
12   ten years.  So it is one year to ten years.
13          Are my rulings with respect to the defense objections
14   clear?
15          MR. BOSTIC:  Yes, Your Honor.
16          MR. O'HARA:  Yes, Your Honor, I believe so.
17          THE COURT:  And Mr. Bostic, does the defense have any
18   further objections, modifications, or corrections of the
19   presentence report?
20          MR. BOSTIC:  No, Your Honor.
21          THE COURT:  Assistant United States Attorney O'Hara,
22   does the Government have any further objections, corrections,
23   or modifications to the presentence report?
24          MR. O'HARA:  No, Your Honor.
25          THE COURT:  Then as it continues to stand, the
```

escribers
www.escribers.net | 800-257-0885

Colloquy

1    guideline range in this case is 121 months to 151 months based

2    on a total offense level of 29 and a criminal history category

3    of IV.

4              Are there any motions for departure in this case?

5              MR. O'HARA:  No motion for departure, Your Honor.

6              MR. BOSTIC:  No, Your Honor.

7              THE COURT:  Very well.  Mr. Bostic, I know you have

8    motion for a downward variance.  Do you have any evidence you

9    would like to present, sir?

10             MR. BOSTIC:  Your Honor, we submitted with our

11   sentencing memorandum Dr. Hayworth's report and some literature

12   on abused children and the impact.

13             THE COURT:  As well as the letter from --

14             MR. BOSTIC:  And the letter from his uncle, Mr.

15   Horninger.

16             THE COURT:  And Mr. O'Hara, do you have any objection

17   to the Court accepting and considering the report and

18   psychological evaluation of Dr. Hayworth, the letter of Paul

19   Horninger, and the article on, "New Directions in Childhood

20   Abuse and Neglect"?

21             MR. O'HARA:  Their admission, Your Honor, no.

22             THE COURT:  Very well.  Without objection, they are

23   admitted and will be considered.

24             Any other evidence, Mr. Bostic?

25             MR. BOSTIC:  Your Honor, I'm aware that this, I

Colloquy

1    believe, is referencing the PSR, but Mr. Elonis handed me some

2    certificates from some courses that were done at Lehigh County

3    prison while awaiting the resolution of this matter, and I

4    think this is important to this case.  There's a course he

5    completed for Thinking for the Future.  There's a course he

6    completed for Introduction to Domestic Violence for Men,

7    and/or -- and there's also a course for anger management.  And

8    I have the certificates here, Your Honor.  I believe this is

9    documented.  I show them to the Government.  I didn't intend to

10   submit them for the record, but if the Court would wish, I'll

11   hand them up as well to mark them.

12          THE COURT:  Assistant United States Attorney O'Hara,

13   do you have any objection to the defense exhibits?

14          MR. O'HARA:  I do not, Your Honor.

15          THE COURT:  Very well.  They will be admitted into

16   evidence and will be considered on sentencing.

17          MR. BOSTIC:  Thank you, Your Honor.

18          THE COURT:  Anything further, Mr. Bostic?

19          MR. BOSTIC:  Not in terms of any submissions, Your

20   Honor.

21          THE COURT:  Mr. O'Hara, does the Government have any

22   evidence to present in this matter?

23          MR. O'HARA:  Your Honor, in terms of evidence, no.  We

24   do have the victim impact statement from one of the victims

25   that we would like to read as part of our presentation whenever

Colloquy

1   the Court deems that appropriate.

2          THE COURT:  You may proceed with it now.  And what I

3   suggest is we proceed in the following manner.  After I've

4   heard the victim impact, if there's no further evidence to

5   present, I'll allow the Assistant United States Attorney to

6   argue, followed by Mr. Bostic.

7          And then Mr. Elonis, you'll have the opportunity to

8   allocute.

9          Assistant United States Attorney O'Hara, you may

10  proceed with the victim impact witness statement.

11         MR. O'HARA:  Yes, Your Honor.  This is a victim impact

12  statement of Assistant United States Attorney Sherri Stephan,

13  who is present in the courtroom, and it reads as follows.

14         "My passion has been to specifically prosecute those

15  that do harm to others.  I became the defendant's target

16  because I did my job.  Defendant takes great pleasure in

17  causing others significant distress and instilling fear.

18  Distress and fear he caused me are very real and tangible

19  harms, the kind of harm that made me not feel safe in my own

20  home, to worry about my son playing in the yard, to install a

21  security system, and that overall made me worry about my

22  family's safety.  The defendant simply took away my right to

23  feel safe.  No one should have the right or ability to do so.

24  The harm he caused is the exact type of harm he intended and

25  bragged about to put me and others in fear.

Colloquy

1    "The worry that I felt was compounded by the knowledge

2    that the defendant has no moral compass, the knowledge that he

3    likes to gain attention through criminal behavior, and the

4    knowledge that he wants to be notorious, no matter the cost.

5    As proof, one need only look to the defendant's worship of Adam

6    Lanza, a monster who took the lives in innocent children,

7    egregiously evil actions that in the defendant's own distorted

8    mind he took credit for instigating.

9    "In my 2021 sentencing memorandum where the

10   defendant's prior conviction for the same kind of criminal

11   behavior I wrote" -- quote -- "The defendant was spiraling out

12   of control.  People were telling him he was out of control.  He

13   was warned, he was cautioned, and he simply did not care.  In

14   fact, his actions demonstrated that he wanted to put people in

15   fear.  He wanted to be acknowledged.  He wanted to create

16   commotion, controversy, and he wanted to hurt and make fearful

17   people in his own distorted mind were hurting him.  Nothing has

18   changed.

19   "One of the exhibits presented at the defendant's

20   first trial was a communication he saved on his computer

21   written by a former coworker about him.  It stated" -- quote --

22   'We are watching a ticking time bomb just waiting for it to go

23   off, and we don't know how to disarm it'" -- end quote.

24   "Those exact fears were and are shared by many,

25   including me.  As stated, this is compounded by the knowledge

Colloquy

1    that he is an attention-seeker and has demonstrated that he has

2    no concern at all if the attention he so desperately craves

3    comes from hurting others.  The defendant's repeat criminal

4    conduct has conclusively proved that he will not be deterred.

5    His prior conviction and spending years of his life

6    incarcerated have done nothing to alter his pattern of

7    behavior.  He is indeed a ticking time bomb, one that I had to

8    hope never went off in a more dire way.

9         "I think the best example of how the defendant's

10   criminal acts have affected me is that since he has been

11   incarcerated, I have regained some peace that I was not

12   afforded when he was living among us.  I have not had to worry

13   about him showing up at my door and what I would do if that

14   occurred.

15        "I hope the sentencing Your Honor gives the defendant

16   today continues to provide me that level of peace for the

17   longest time possible."

18        And it's signed Sherri A. Stephan.

19        Thank you.

20        THE COURT:  Thank you very much, sir.

21        MR. O'HARA:  I'd like to make that part of the record,

22   Your Honor.

23        THE COURT:  Certainly.

24        And Mr. Bostic, you have no objection to the victim

25   impact statement being made part of the record?

escribers
www.escribers.net | 800-257-0885

Closing Argument - Plaintiff

1       MR. BOSTIC:  Your Honor, I'll ask for a copy of that.

2  I haven't gotten a copy of this point, but the Government read

3  it.  We have no objection.  I understand the witness is here

4  and would be free to present to this Court.  So we have no

5  objection.

6       THE COURT:  Thank you very much, sir.

7       And Assistant United States O'Hara, you may argue on

8  behalf of the Government as to sentence.

9       MR. O'HARA:  Judge, looking at the 3353(a) factors --

10  may I remain seated, Your Honor?

11       THE COURT:  Absolutely, sir.

12              PLAINTIFF'S CLOSING ARGUMENT

13       MR. O'HARA:  Looking at the 3353(a) factors, Your

14  Honor, this Court is to consider, they don't play well for Mr.

15  Elonis.  The nature and circumstances of the offense; the

16  history and characteristics of the defendant; the need for the

17  sentence to reflect the seriousness of the offense, promote

18  respect for the law, provide just punishment, afford adequate

19  deterrents to criminal conduct to protect the public from

20  further crimes of the defendant, they don't play well for Mr.

21  Elonis.  They're not in his favor.

22       Judge, I think from day one you've had such a grasp on

23  this case.  It's just incredible, the insight that you've had.

24  You have a defendant who has shown absolutely no remorse, none

25  whatsoever.  Here we are again after he was previously

escribers
www.escribers.net | 800-257-0885

Closing Argument - Plaintiff

1    convicted of four counts of threatening communications after a

2    forty-four-month jail sentence.  He's learned absolutely

3    nothing, absolutely nothing.  There's no doubt -- and as to the

4    Court -- there was no doubt that he intended to place these

5    three women, his victims, in fear of death, serious bodily

6    injury, and he succeeded.  They were absolutely terrified.  He

7    terrorized and terrified.

8            Paragraph 179 of the presentence report indicated the

9    risk of recidivism is high, and he's at high risk to the

10   community.  We have not only victims who need protected, but a

11   community that needs to be protected.

12           Paragraph 54, Judge, of that PSR, the case in a

13   microcosm.  If you read some of these newspaper articles these

14   days, if it's a lengthy article they have a little summary at

15   the top of the article so you don't have to waste the rest of

16   your time reading the lengthy article.

17           Paragraph 54.  Elonis used the internet, Twitter,

18   emails, phone calls, and voicemails to place his victims in

19   fear, fear that he would hurt them or injure them or worse.  He

20   intended many of his communications as threats, and he

21   certainly knew that they would be perceived or taken as threats

22   by his three female victims, each of whom he was angry with,

23   each of whom he had a grudge against.  He didn't pick these

24   three women out of a phone book.  People don't even use phone

25   books anymore.  These are people that -- are women that he had

www.escribers.net | 800-257-0885

Closing Argument - Plaintiff

1    grudges against.  That was his goal, to place these women in

2    fear.  He craved the attention, Judge.  He appears to thrive on

3    it.

4         Paragraph 133.  He also noted that he was

5    participating in a podcast related to his court case and

6    admitted that he enjoys the attention.  He enjoys it, Judge.

7    One of those emails in our evidence book -- one of the Twitter

8    posts -- enjoy putting people in fear.  That's what he does.

9    That's what makes his life important.  He enjoys the attention.

10   He craves it.  It gives meaning to his life, Your Honor.

11        There's been a motion for variance regarding mental

12   illness.  He's had, since 2010, to do something about that, to

13   get help.  He's thirty-nine.  He's going to be forty years old

14   this year.  If you need help, get help.  He's not interested in

15   getting help.  He's never been interested in getting help.

16   What he is interested in is getting even, getting even with

17   people that he perceives have somehow wronged him.

18        I see, Government sees, that argument for variance as

19   an argument for more jail time because you've got a victim who

20   claims to have a mental illness but won't do anything about it.

21   He may tell you today on the day of sentencing for his three

22   felony convictions that he's going to do something about it.

23   He's done nothing about it since 2010.

24        He tries to get even with the people he perceives have

25   wronged him, his ex-wife -- we're going to talk about her in a

escribers
www.escribers.net | 800-257-0885

Closing Argument - Plaintiff

1    few minutes -- his ex-girlfriend, an Assistant United States

2    Attorney who prosecuted him.  In his previous case it was a

3    female FBI agent who came to his house.

4         Paragraph 177.  The conduct is the continuation of his

5    conduct in his prior federal conviction.  The Court indicated

6    one of the victims in this case is the victim from a previous

7    case, his ex-wife.  The Court needs to consider the protection

8    of the public, and the Court needs to consider the protection

9    of these three victims.

10        Victim number 3, his ex-wife, she met him when she was

11   fourteen.  They married when she was sixteen.  They had two

12   children.  Those children are now adults.  She moved out in

13   2010.  Judge, it's 2023.  She was the victim in the previous

14   case.  He was convicted of posting threats to injure and kill

15   her.  He was convicted of that, and that conviction still

16   stands.  It really happened.  It's not something that she

17   imagined.  This isn't an overly sensitive victim who got scared

18   because he looked at her the wrong way.  He was convicted of

19   threatening to injure and kill her.  She testified in the

20   previous trial that she was terrified of him and she was in

21   fear for her life.  He didn't care.  He doesn't care.

22        He got out of prison from his previous conviction.  He

23   got off of supervised relief -- release.  What did Victim

24   number 3, his ex-wife, get?  He's banging on her doors of her

25   residence at all hours of the night.  He's leaving her

Closing Argument - Plaintiff

1    voicemail after voicemail after voicemail, so much so that her

2    family couldn't leave voicemails, her physicians, her

3    employment.  He would use up all the space on the voice box --

4    on the message box.  He would leave her creepy gifts.  She got

5    numerous texts, emails, Twitter posts.  Judge, he took her

6    face, he superimposed it on a cemetery stone next to some

7    horrendous rap lyrics.  And she's not supposed to take that as

8    a threat if we believe his testimony?

9         Judge, she's now thirty-five years old.  She just

10   wants to be left alone.  She decided against coming here today

11   because she said, it's only going to make him more angry with

12   me, like it did last time, and whatever I say to the Court,

13   he's going to use it against me down the road.  She's already

14   anticipating when he gets out of jail next time.  I don't know

15   personally, Judge, if I have ever encountered a person so

16   afraid and emotionally exhausted from dealing with one person

17   like Anthony Elonis.  She's already worried about what's going

18   to happen when he gets out of jail the next time.  That's why

19   she didn't want to come here today.

20        Victim number 2, his ex-girlfriend.  The Court said

21   she tried to do it the right way.  She got protection from

22   abuse orders against him.  He violated them twice.  He's in

23   violation of indirect criminal contempt twice.  I think the

24   last time he did a thirty-to-sixty-day jail sentence.  He's not

25   going to stop.  A PFA's not going to stop him.  What is?  What

escribers
www.escribers.net | 800-257-0885

Closing Argument - Plaintiff

1   is?

2       Among the things he posted about Victim number 2,

3   Shauna Marks, was a sexually explicit image of her that he

4   publicly posted on the internet for the world to see.  He sent

5   some of those pictures and email directly to AUSA Sherri

6   Stephan.  Shauna, the victim, was humiliated.  She was

7   embarrassed.  She took the stand, Judge, in a public forum

8   before twelve jurors, eleven of whom were men, if the Court

9   recalls, and it was intern season, so we had a number of people

10  in the gallery watching over the summer.  The Government had to

11  use those photographs, those sexually explicit images of her.

12  Think about that for a moment.  She sat there and testified

13  while we used those sexually graphic images of her as evidence,

14  and she did it.  Why?  Because her fear of Anthony Elonis --

15  her legitimate fear of Anthony Elonis outweighed any

16  humiliation or embarrassment that she felt -- her fear.

17      Then you have Victim number 1 in the indictment, the

18  Assistant United States Attorney who prosecuted him previously.

19  You heard the victim impact statement that she wrote.  Judge, a

20  person who gets up every morning and does her job, does her

21  best to try to protect this community and the people of this

22  district from harm, she prosecutes child predators.  Now, this

23  is not a person who's easily rattled.  She's seen some

24  terrible, terrible things, things that criminals do to children

25  over her twenty-some years as a prosecutor.  But he had to get

US v. Anthony Elonis, Exhibit B, p. 43
www.escribers.net | 800-257-0885

Closing Argument - Plaintiff

1    even with her.  That was his goal, and that will continue to be

2    his goal.

3           Judge, you have a defendant who just doesn't care.

4    He's going to do what he wants to do, no matter what this Court

5    tells him and any other court tells him.  He'll now try to tell

6    you that he had a rough childhood.  Lots of people have rough

7    childhoods.  He'll now try to tell you that he has some mental

8    disorder that this Court should grant him some leniency.  We

9    don't see it that way, Judge.  We don't see it that way.  His

10   goal was to make these people feel fear for their lives.  He

11   succeeded.

12          The guideline range here, Judge, as you've indicated,

13   is 121 to 151 months, and the Government respectfully requests

14   a sentence the high end of that guideline range, 151 months.

15          Thank you.

16          THE COURT:  Thank you very much, sir.

17          Mr. Bostic, you may argue on behalf of Mr. Elonis,

18   sir.

19          MR. BOSTIC:  Thank you, Your Honor.

20                DEFENDANT'S CLOSING ARGUMENT

21          MR. BOSTIC:  The Government cited to the 3553 factors

22   at that this Court must consider in imposing the sentence.  And

23   as eloquent as the Government's presentation was, the

24   Government did not mention rehabilitation and treatment.

25          So I want to start there because Mr. Elonis is in this

Closing Argument - Defendant

1    courtroom today having suffered tremendously, and it's that

2    suffering that got him from point A to present here. It's the

3    misdiagnoses and the sporadic treatment of mental health

4    illness. While fortunately, as wealthy as we are in this

5    country, mental illness oftentimes is not properly addressed

6    for many reasons, but for particularly for people who are poor

7    and who do not have the means to have consistent treatment by

8    consistent experts. We find situations where the mental health

9    drives a lot of their actions.

10           I cannot stand before this Court and suggest that the

11   offenses for which the jury convicted Mr. Elonis are not

12   serious, and I will not do that. But this Court is empowered

13   with tremendous discretion, authority, and knowledge in

14   determining the appropriate sentence for a defendant who is

15   afflicted as Mr. Elonis is.

16           I believe that the sentence that I recommended in my

17   sentencing memorandum of ninety-six months is appropriate. It

18   is sufficient, but no more than necessary to accomplish all the

19   goals of sentencing. Deterrents, he's going to be locked up

20   for a substantial period of time. He'll be older. Recidivism

21   tends to dip down as people get older. But most importantly,

22   as Dr. Hayworth indicated, there's a need for medical

23   intervention, and this Court has at its disposal the ability to

24   address that while he's in prison, make certain he gets the

25   right treatment, including cognitive behavioral treatment, so

www.escribers.net | 800-257-0885

Closing Argument - Defendant

1    he understands the disease -- the nature of the disease -- the

2    importance of medication, and you get the punitive aspects of

3    sentencing in a case like this.

4          We cannot ignore or we -- as a society we ought not to

5    ignore the fundamental imprint that trauma abuse and trauma can

6    have on directing the person in one direction versus another.

7    We can't excuse it.  Not everybody's blessed with parents that

8    teach them how to interact with society in the best and the

9    most effective way or to shield them from bullying at school

10   that ostracized them and puts them in a closet where all they

11   have are the thoughts within their heads.

12         In reading about and learning about Mr. Elonis, in

13   many ways he was imprisoned as a child by parents that were

14   neglectful and did what they thought would help -- I'm not

15   going to get in their heads -- but did what most parents would

16   not do, essentially lock a child in his room with a TV and

17   video games.  There was no effective intervention then, but

18   we -- this Court and society -- can have that intervention now.

19   I wrote a lot in my sentencing memo.  Dr. Hayworth, I think,

20   fully defines and outlines the treatment modality that needs to

21   go forward, as well as document the history.

22         I'll leave the Court with this.  It is clear, at least

23   from my perspective, that we have to address the fog and get

24   rid of the fog and through treatment for Mr. Elonis and while

25   also punishing him for what the jury convicted him of, but we

Closing Argument - Defendant

1    do not have to warehouse him.  We do not have to do that to

2    accomplish all the purposes of punishment.  Whether this Court

3    impose a sentence of the bottom of the guideline range or goes

4    below as I requested the Court, it must address the fundamental

5    matters that Mr. Elonis -- that Dr. Hayworth set forth and take

6    in mind the treatment modality.

7            And we know that there are many federal facilities

8    that can provide that type of treatment and set Mr. Elonis on a

9    platform and on a path when he gets out that he understands his

10   disease, he understands how to manage it, and he understands

11   that medication is an integral part of it.  And I got to

12   emphasize that.  You have to realize and know the problem

13   before you can make the adjustments necessary.

14           And when we talk about delusions of grandeur and we

15   talk about grandiosity and a run-in with suggestions where we

16   have a podcast interviewer -- NPR -- interviewer telling Mr.

17   Elonis, well, he's an accidental warrior, a protector of the

18   First Amendment.  We need to address how his mind soaks that in

19   and how it comes out externally, because I think the Court

20   would agree that if you pick anyone else in this courtroom here

21   today and say that to that person, it would be scoffed off and

22   we go on about our business, but for Mr. Elonis, it comes out

23   differently.  It comes out in the notion that he best

24   understands the First Amendment.

25           So I ask this Court, as his uncle, Mr. Horninger, did,

Closing Argument - Defendant

1   to show mercy, taking into consideration as I said the

2   seriousness aspect of this case as well.

3            Thank you, Your Honor.

4            THE COURT:  Thank you very much, sir.

5            Mr. Elonis, you have an absolute right to present any

6   evidence you wish to present in extenuation or mitigation.  You

7   also have an absolute right to say anything you would like to

8   say to this Court before I impose sentence.  Is there any

9   further evidence you would like to present during this

10  sentencing hearing or anything you would like to say, sir?

11           THE DEFENDANT:  I decline.

12           THE COURT:  Very well.

13           I adopt and credit the presentence report, its factual

14  findings, and the guideline application as we've already

15  discussed.  Under the guidelines, the range would be between

16  121 and 151 months.

17           I've also considered the submissions of counsel in

18  this case, and I've considered what's been presented here today

19  and the arguments of counsel.  All the pieces of the puzzle

20  sort of come together.  And I think the piece that didn't

21  surprise anyone familiar with this case, but we were glad to

22  have it, was the psychologist's evaluation of Mr. Elonis.

23           And as I think both counsel have recognized,

24  everything is a two-edged sword in this case.  Every reason

25  that would explain what Mr. Elonis did and probably find him

escribers
www.escribers.net | 800-257-0885

Colloquy

1    less culpable also is a reason to believe that he is a danger

2    to society and a danger to these particular victims.

3              Threats are an interesting thing because some threats

4    are made in anger.  I think we all understand that.  And some

5    threats are cold and calculating.  They're done over time.

6    They are done persistently and they're done to shock, I assume.

7    Who else would reference Adam Lanza?  Who would use any threat

8    something so despicable as a school shooter who would shoot

9    elementary school students?  Why would that be in as part of

10   the threat?  Does it mean that Mr. Elonis is trying to

11   calculate what would have the most shock value, or does it mean

12   he truly reveres a school shooter and identifies with him?

13             And so the other thing about threats is not just the

14   nature of the threat and the circumstances when it's made, but

15   also does he intend to carry it out?  If someone makes a

16   threat, do they intend to carry it out?  Because that's very

17   important in a case where you're threatening a law enforcement

18   officer such as an Assistant United States Attorney or a former

19   wife or a former girlfriend.  Does he intend to carry it out?

20   Did he have an opportunity to and did he not?  Did he make any

21   preparation to carry it out or did he not?

22             In this particular case, all of those have to be

23   considered because it goes all into the danger.  And when

24   someone uses a school shooter to try to threaten, that type of

25   threat isn't just a simple, I'm going to kill you or I'm going

Colloquy

1    to hurt you.  It is, I revere someone who goes out and shoots

2    up schools.  It's an interesting way to try to terrorize and

3    very effective.  It was very effective in this case.  There's

4    no question.  I witnessed the three victims on the stand.

5    Obviously, you were successful to the extent you want to

6    terrorize them.  You were successful.  And it was your intent.

7    I have no doubt about that as did the jury not have any doubt

8    about that, that it had been proved beyond a reasonable doubt

9    that you intended the very effect that naturally flowed from

10   the threat.  And why you chose these three particular and

11   female victims only because it seems like your grudges are

12   aimed more at females, because we have two separate cases now

13   we get to follow.  That's very unusual that they would be so

14   similar and to carry through with this.

15          But as I considered all of this, I have no doubt that

16   this bipolar 2 diagnosis has a large part to play in this,

17   because with all of us, there are things that impact on our

18   judgment.  And Mr. Bostin, you're right on them -- the greatest

19   rehabilitative tool is to get somebody old because youthfulness

20   impacts on judgment, as getting older impacts on your judgment,

21   and we see recidivism go down as people get older.  So one of

22   the best rehabilitative tools is to lock people up for a long

23   time.  I'm not saying that's coming into play with me at all,

24   but -- because older people don't commit crimes at the rate

25   younger people do.

escribers
www.escribers.net | 800-257-0885

1        But other things impact on judgment.  Passion.  So

2   we've got a girlfriend, an ex-wife, and the person that

3   prosecuted you the first time around.  Passion, drug and

4   alcohol use, youthfulness, as I said, mental illness.  And

5   oftentimes there'll be a combination of those.  And here, there

6   might've been some anger as part of that passion, but I don't

7   see anger as being at the root of all this.  There's a much

8   more devious evilness involved in these threats just because of

9   the nature of them and how you thought them through.

10        And then I think you thought you were being really

11  smart by having to interpret the threat by understanding what

12  threat was made in the prior case as though that would somehow

13  make it more difficult to prosecute.  In fact, all it really

14  did was tie it in, and that it was more clear that it was you

15  making the threats, but you never denied that.  You never

16  denied making the treats.  You took the stand and you admitted

17  to it all.  Now, that's what makes it so interesting.

18        But when I say interesting, I don't mean to minimize

19  the impact that your crimes have had on these victims, but it

20  is interesting.  It is interesting.  How did the mental illness

21  come into play?  How did the traumatic childhood you had?  And

22  I know in the motion for variance, the two points are exactly

23  what are in play here, the childhood trauma and this bipolar 2

24  disorder.

25        But I would be remiss if I didn't mention you've had

Colloquy

1   other potential diagnoses here.  Dysthymic disorder -- I don't

2   even know what quite that is -- but with chronic depressed

3   mood, major depression; avoidant personality disorder;

4   obstructional (sic) defiant disorder; social phobia, social

5   anxiety, maybe even schizophrenia, but the bipolar 2 is pretty

6   clear.

7          But all of this suggests that you're troubled.  You're

8   troubled, and not in a happy way.  You're troubled, and it's

9   sad that you're suffering from all this. And it very well may

10  have, in part, been affected by your childhood trauma, by the

11  experience with your parents, with your sister, et cetera.  It

12  was noted that you were abused by your parents but particularly

13  your mother, particularly your mother.  And your father, of

14  course, left.  So you were with her once you reached your

15  teenage years.  You dropped out of school.  You were bullied

16  because of obesity and a hand twitch.

17         So the pattern starts to develop.  Now, you couldn't

18  control the circumstances of your birth.  And the other thing

19  about that is oftentimes mental health issues are hereditary.

20  And so if your mother might've had bipolar disorder and/or your

21  father, they might've not been able to create an environment

22  for you to help you if you, in fact, were suffering from it.

23  And thus, the two work hand-in-hand that as a result of their

24  mental illness and your mental illness, the whole thing just

25  progresses further.

Colloquy

1        But in you, somehow it manifested itself into this

2   terrorist of sorts who wants to send out these, on one hand,

3   almost ludicrous threats; on the other hand, terrorizing

4   threats.  It's a unique mind.  And because that unique mind has

5   an evilness to it, I have to be very concerned, very concerned

6   about recidivism, but I'm concerned more than just simply

7   recidivism that you're going to continue to make threats.  I

8   think everybody agrees that you need treatment for mental

9   health issues.  No doubt about that.  But even with that

10  treatment, we've had you in jail for forty-four months.  The

11  worst thing you can do, by the way, as a criminal is to commit

12  a crime, be convicted of it, serve your time, and go right back

13  and commit the same crime, because what does that say to the

14  court?  You've heard that term, fool me once, shame on you,

15  fool me twice, shame on me?  What does it say to the court when

16  you go right out and commit these crimes?  It means you can't

17  control yourself.  And that may be that your judgment is

18  impaired by this mental illness -- I think it is -- that you

19  can't control yourself.

20       But I can't sit here and say despite whatever

21  treatment we attempted to get to you with that forty-four-

22  months sentence and three years of supervised release, that now

23  we're going to come up with the answer and I don't have to

24  worry that -- not just that you're going to make these

25  continued threats, but that you're going to carry them out.  If

1    you can't control your behavior in making them, despite being

2    behind bars, despite the punishment you served -- if you

3    couldn't control your behavior despite that, then how do I know

4    you can control your behavior and not go one step further and

5    carry this out thinking in your own mind that you're going to

6    avoid criminal liability by coming up with some kind of legal

7    theory to avoid that or that you can do it in such a way that

8    the Government won't ever be able to convict you?

9            On the other hand, you never have tried to carry this

10   out -- any of these threats -- but you have physically harassed

11   and gone to the sites of these victims.  So it's not as though

12   all of this is at a distance.  It's not.  It's not.  I would

13   feel a little more comfortable if it was -- still reprehensible

14   behavior -- but I'd feel a little bit better if it was.

15           If I were any one of these three victims, I would be

16   very fearful that you would carry out your threat and that they

17   were in danger of physical harm, including up to death, because

18   you don't seem to mind going to jail.  You don't seem to mind

19   paying the price for engaging in criminal conduct.  You knew

20   what happened when you made the first threats.  You went to

21   jail.  It gets up to the Supreme Court.  So now suddenly, you

22   became somewhat famous in the First Amendment area, and you

23   became somewhat of an expert in that because your name became

24   well known in that -- the area of First Amendment jurisprudence

25   and its true threat jurisprudence.  So now you became really

escribers
www.escribers.net | 800-257-0885

Colloquy

1    interested in this.

2           But instead of becoming really interested in it,

3    writing books on it, and focusing on it in a legal way, you

4    tried to use your newfound research and your newfound

5    intelligence -- for lack of a better word -- to now try to use

6    this to try to skirt the bounds of the law -- let me do this

7    because I think I can skirt the bounds of the law.  And it was

8    a unique exercise because you knew if you lost, you're going to

9    go to jail, right?  You knew that because you went to jail the

10   first time.  So you knew if your plan failed, you were going to

11   go to jail.

12          So your plan, as I see it -- and as fully supported by

13   the evidence -- you wanted to put an Assistant United States

14   Attorney, your former wife, and your former girlfriend -- you

15   wanted to put those three individuals in fear of death, or at

16   least of bodily harm.  You wanted to put them in fear, but you

17   wanted to do it in a way that somehow you could skirt the

18   liability for it using your own case -- your own prior case --

19   and others that you researched them and whatever.  So you

20   wanted to accomplish your criminal objectives in a way that

21   would somehow skirt criminal liability.

22          Because of that, I'm less concerned that you would

23   actually engage in violent conduct.  I'm less concerned that

24   you would go to the home of an Assistant United States Attorney

25   and hurt her son or hurt her, but I can't completely discount

Colloquy

1    that.  I'm less concerned that you would go to the home of your

2    former wife or your former girlfriend, but they really have to

3    be worried too because there's repeat instance there, and

4    nothing seems to stop you.  PFAs don't stop you; federal prison

5    doesn't stop you; nothing seems to stop you.

6        I mean, if I were Assistant United States Attorney

7    O'Hara, who I'm sure has no fear of you, I wouldn't be

8    surprised if he's saying, I wonder if I'm going to get a letter

9    and that you're going to try to do it in some way that -- maybe

10   I'll get a letter.  I don't know.  This is just your pattern.

11   This is just your pattern.

12       So all that said, the question then comes back to me,

13   what do I do?  What do I do?  Because I do see a certain

14   sadness about this case and a certain sadness because every

15   life has dignity.  Every life has value.  And in America we

16   value freedom so highly, and your freedom is important, and we

17   don't take it lightly.  But we also at the same time cannot

18   have people -- citizens engaging in the conduct that you're

19   repeatedly engaging in.  So when I look at the factors set

20   forth in Section 3553(a), the nature and circumstance of the

21   offense, you didn't hurt anybody, but you certainly put people

22   in fear and serious fear and you've disrupted their lives, et

23   cetera, and it was a repeat offense.  So the history and

24   characteristic of the defendant, it's a repeat offense.

25       Your other criminal charges, et cetera, just suggest

escribers
www.escribers.net | 800-257-0885

Colloquy

1    to me you've got a mental health issue and you've had trouble

2    with it -- the DUI, the -- this defiant disorder.  It fits

3    right in.  And you had trouble at school; you got bullied; you

4    have trouble fitting in.  And I think that's sad.  I do.  But

5    it's there.  You can see the pieces all fitting together.  You

6    had a wife; you lost her.  You had a girlfriend; you lost her.

7    It's troubling to you.  It's hurtful.  And it's all part of

8    these puzzles.  You need something good happening in your life.

9    You need something good.

10        The need for the sentence imposed reflect the

11   seriousness -- well, that's obvious -- to protect respect for

12   the law and to provide just punishment for the offense, all

13   need to be considered.

14        The need to afford adequate deterrence to criminal

15   conduct and protect the public from further crimes of the

16   defendant.  I mean, there's a message to be sent here to

17   others, but others wouldn't likely engage in this conduct in

18   the way you have.  But I certainly need to protect the public

19   and protect these victims from further crimes by you.

20        The need to provide you with education or vocational

21   training, medical care, or other correctional treatment in the

22   most effective manner.  You need that.  You need vocational

23   training.  Most importantly, you need mental health training.

24   You need drug and alcohol treatment.

25        The guidelines and policies statements issued by the

escribers
www.escribers.net | 800-257-0885

Colloquy

1    sentencing commission, the need to avoid unwarranted sentencing

2    disparities among defendants with similar records who have been

3    found guilty of similar conduct.  And this is where the

4    guidelines come into play.  They're very helpful in making sure

5    that just because you're appearing before me, you don't get a

6    sentence that's substantially different than if you appeared

7    before a different judge.  But I do have the discretion to

8    impose a sentence both below and above the guidelines, and I've

9    considered the variance motion that your counsel has raised,

10   and I've given them, I think, meaningful consideration based on

11   this hopefully not overly long explanation of what I've

12   considered in imposing sentence, and of course, to provide

13   restitution in this case, and no restitution has been sought in

14   this case.

15          So I've considered all of this in trying to determine

16   what an appropriate sentence would be in this case, but in

17   light of the repeat nature of this offense, in light of the

18   fact that you do suffer from a mental illness that does impact

19   on your judgment -- and it's been shown over and over and

20   over -- and despite what you've suffered as a child, it doesn't

21   explain why you would cyberstalk these three victims after

22   having previously been convicted of similar types of threat

23   offenses against four other victims and serving a forty-four-

24   month sentence.

25          So after considering all the factors of Section

Colloquy

1    3553(a), I have determined that a sentence of 151 months is the

2    appropriate sentence in this case.  I note that it is a

3    guideline range sentence, but it is at the high end of the

4    guideline range.

5            I also find that you do not have the ability to pay a

6    fine, so I'm not going to impose a fine, but I am going to

7    require three years of supervised release upon your release

8    from incarceration, and you are -- by law I'm required to

9    impose a 300 dollar special assessment.  So I am going to

10   impose that sentence at this point.

11           I did not see anything with respect to forfeiture.

12   Assistant United States Attorney O'Hara, is there any

13   forfeiture motion in this case?

14           MR. O'HARA:  No, Your Honor.

15           THE COURT:  Pursuant to the Sentencing Reform Act of

16   1984, it is the judgment of the Court that the defendant,

17   Anthony Elonis, is hereby committed to the custody of the

18   Bureau of Prisons to be imprisoned for a term of 120 months on

19   Count II and a term of 31 months on each of Counts I and III,

20   both terms to be served consecutively to the term imposed on

21   Count II to the extent necessary to produce a total term of 151

22   months.

23           Upon release from imprisonment, the defendant shall be

24   placed on supervised release for a term of three years on each

25   of Counts I, II, and III, such terms to run concurrently.

eScribers
www.escribers.net | 800-257-0885

Colloquy

 1   Within seventy-two hours of release from the custody of the

 2   Bureau of Prisons, the defendant shall report in person to the

 3   probation office in the district to which the defendant is

 4   released.

 5          While on supervised release the defendant shall not

 6   commit another federal, state, or local crime; shall be

 7   prohibited from possessing a firearm or other dangerous device;

 8   shall not possess an illegal controlled substance; shall submit

 9   to the collection of a DNA sample at the direction of the

10   United States Probation Office; and shall comply with the other

11   standard of conditions that have been adopted by this Court.

12          The defendant must submit to one drug test within

13   fifteen days of commencement of supervised release and at least

14   two tests thereafter as determined by the probation officer.

15          In addition, the defendant shall comply with the

16   following special conditions.  The defendant shall participate

17   in a mental health program for evaluation and/or treatment and

18   abide by the rules of any such program until satisfactorily

19   discharged.

20          The defendant shall refrain from the use of alcohol

21   and the illegal possession and/or use of drugs and shall submit

22   to urinalysis or other forms of testing to ensure compliance.

23          It is further ordered that the defendant shall

24   participate in substance abuse treatment and abide by the rules

25   of any such program until satisfactory discharged.

escribers
www.escribers.net | 800-257-0885

Colloquy

1    The defendant shall participate in a program at the

2    direction of the probation officer aimed at obtaining a GED,

3    learning a vocation, or improving the defendant's literacy,

4    education level, or employment skills in order to develop or

5    improve skills needed to obtain and maintain gainful

6    employment.  The defendant shall remain in any recommended

7    program until completed or until such time as the defendant is

8    released from attendance by the probation officer.

9    The defendant shall attend a public, private, or

10   nonprofit offender rehabilitation program that has been

11   approved by the Court in consultation with a state coalition

12   against domestic violence or other appropriate experts if an

13   approved program is available within a fifty-mile radius of the

14   legal residence of the defendant.

15   The defendant is prohibited from having any contact

16   with the victims of the offenses, to include telephone, text,

17   email, letter, or in-person visits to their homes or places of

18   employment.  The defendant is prohibited from posting social

19   media content that pertains to any of the victims of the

20   offense.  If the defendant needs to have contact with his ex-

21   wife pertaining to the children, he is to do so through the

22   courts or a court-appointed mediator.

23   The defendant shall submit to an initial inspection by

24   the U.S. Probation Office and to any examinations during

25   supervision of the defendant's computer and any devices,

Colloquy

1  programs, or application.  The defendant shall allow the

2  installation of any hardware or software systems which monitor

3  or filter computer use.  The defendant shall abide by the

4  standard conditions of computer monitoring or filtering that

5  will be approved by this Court.  The defendant is to pay the

6  cost of the computer monitoring, not to exceed the monthly

7  contractual rate, in accordance with the probation officer's

8  discretion.

9          The defendant shall submit his computers and other

10  electronic communications or data storage devices or media to a

11  search conducted by a United States probation officer.  Failure

12  to submit to a search may be grounds for revocation of release.

13  The defendant shall warn any other occupants that the computers

14  and other electronic communications or data storage may be

15  subject to the searches pursuant to this condition.  An officer

16  may conduct a search pursuant to this condition only when

17  reasonable suspicion exists that the defendant has violated a

18  condition of his supervision and that the areas to be searched

19  contain evidence of this violation.  Any search must be

20  conducted at a reasonable time and in a reasonable manner.

21          The defendant shall provide the U.S. Probation Office

22  with full disclosure of his financial records, to include

23  yearly income tax returns upon the request of the U.S.

24  Probation Office.  The defendant shall cooperate with the

25  probation officer in the investigation of his financial

escribers
www.escribers.net | 800-257-0885

Colloquy

1   dealings and shall provide truthful monthly statements of his

2   income.

3        The defendant is prohibited from incurring any new

4   credit charges or opening additional lines of credit without

5   the approval of the probation officer unless the defendant is

6   in compliance with any fine obligation.

7        I'm not imposing a fine in this case, and I'm not

8   imposing any restitution.  So the only thing that's being

9   imposed is the mandatory 300 dollar special assessment.  So

10  both of these financial conditions really do not apply in your

11  particular case, and I'm going to strike both them, Mr. Elonis.

12  There's no need for your financial information to be -- or your

13  financial wherewithal to be affected by this sentence.  The

14  Court finds that you do not have the ability to pay a fine, so

15  the Court is going to waive the fine in this case.

16       It is further ordered that you shall pay to the United

17  States a total special assessment of 300 dollars, which shall

18  be due within -- which shall be due immediately.

19       I note that the only sentence that is correct is the

20  lowest sentence sufficient to satisfy the purposes of

21  sentencing, and I find that this is the correct sentence

22  because I do find that it is the lowest sentence sufficient to

23  satisfy the purposes of sentencing.

24       Mr. Elonis, do you understand the sentence that I've

25  imposed?

Colloquy

1        MR. BOSTIC:  Your Honor, if I may address the Court on

2   that.

3        THE COURT:  Certainly.

4        MR. BOSTIC:  I just want to double-check one thing.  I

5   believe the Court indicated a total of 151 months.  When -- as

6   I caught it, I believe -- when you sentenced as to the -- I

7   think it's Count I and III, you sentenced thirty-one months

8   consecutive.

9        THE COURT:  Correct.  The way I tailored the

10  sentence -- and I want to make sure this is correct -- with

11  respect to Count II there's a maximum of ten years.

12       MR. BOSTIC:  Yes.

13       THE COURT:  So I imposed 120 months on Count II.  And

14  then I imposed two concurrent sentences of thirty-one months --

15  because the maximum sentence that could be imposed for Counts I

16  and III is five years per count.  So with that additional

17  thirty-one months, that brought it up to a total of 151 months.

18  So 120 months on Count II, and then two concurrent terms -- and

19  I misstated that -- two concurrent terms of thirty-one months

20  on I and III, but they were to run consecutive to the 120-

21  month-sentence for a total of 151.

22       MR. BOSTIC:  That's the clarification that Your

23  Honor -- thank you.

24       THE COURT:  Thank you, sir, for making sure that was

25  clear.  And Mr. Bostic, is Mr. Elonis asking for any

www.escribers.net | 800-257-0885

Colloquy

1    recommendations with respect to the sentence as to

2    incarceration, the location, or otherwise?

3            MR. BOSTIC:  May I have a moment, please?

4            THE COURT:  Certainly, sir.

5        (Counsel confer with defendant)

6            MR. BOSTIC:  Your Honor, if the Court would consider

7    placing Mr. Elonis -- or recommended that Mr. Elonis be placed

8    in a facility -- a medical facility where he can get the type

9    of treatment that was outlined in Dr. Hayworth's report.  It

10   needs to be a combination of cognitive behavior therapy as well

11   as medication.

12           THE COURT:  Okay.

13           MR. BOSTIC:  If appropriate I would recommend that,

14   and Mr. Elonis still need that.  I have liberty to do that with

15   the Court.  So that's my recommendation.

16           THE COURT:  Does the Assistant United States Attorney

17   have any objection?

18           MR. O'HARA:  Not to that, Your Honor.

19           THE COURT:  Very well.  I am recommending that the

20   Bureau of Prisons take into account the mental health

21   conditions that have been identified in the psychological

22   report and that they have him incarcerated in a facility that

23   is best able to address those mental health concerns.

24           Do you think that will do it, Mr. Bostic?

25           MR. BOSTIC:  I believe so, Your Honor.

escribers
www.escribers.net | 800-257-0885

Colloquy

1          THE COURT:  Very well.

2          Mr. Elonis, do you understand the sentence that I've

3    imposed?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And do you understand the reasons for the

6    sentence, sir?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Do you have any questions for me at all,

9    sir?

10          THE DEFENDANT:  No.

11          THE COURT:  Counsel, anything further before I advise

12    Mr. Elonis of his appellate rights?

13          Assistant United States Attorney O'Hara?

14          MR. O'HARA:  A few things, Your Honor.  I would ask

15    the Court for the Court indicate that as a condition of the no

16    contact with any of the three victims, I would ask the Court to

17    consider a condition that the defendant not be allowed to have

18    any contact with any Government witnesses who testified in this

19    case.  We did have a female FBI agent who testified and a

20    female FBI analyst who also testified as Government witnesses

21    in this case, Ann Kirkland and Lauren Schwani (ph.).  We would

22    ask that Mr. -- we'd ask the Court to consider imposing a

23    condition that Mr. Elonis not be allowed to have any contact

24    with any of those individuals.

25          THE COURT:  Mr. Bostic, do you have any objection?

escribers
www.escribers.net | 800-257-0885

Colloquy

1      MR. BOSTIC:  We have no objection, Your Honor.

2      THE COURT:  Very well.  I will add in a condition that

3  Mr. Elonis is prohibited from having any contact with any of

4  the Government witnesses that testified during the course of

5  his trial in this case.

6      MR. O'HARA:  Right.  And we'd ask the Court -- I think

7  this has to be ultimately a recommendation from the Court

8  because I think it's in the hands of the BOP, but we would ask

9  that while Mr. Elonis is incarcerated that he not be allowed

10  access to computers, tablets, or electronic devices or any

11  devices which would allow him to post on social media while in

12  Bureau of Prisons custody.  I think that's a -- I think the

13  Court has to make a recommendation rather than a condition

14  because I think ultimately that's in the hands of the BOP.  I

15  may not be right about that, but I ask the Court to make that

16  recommendation.

17      THE COURT:  Mr. Bostic, what are your thoughts?

18      MR. BOSTIC:  Your Honor, we would have to object to

19  that.  The BOP has instituted a system of communication that

20  involves CorrLinks, as well as text messages to counsel.  Many

21  of my clients, when they're far away, that's the best and

22  easiest way for them to communicate.  And the BOP has rigorous

23  oversight of those two systems, and I -- any improper behavior

24  they'll be cut off immediately and subject to punishment or

25  disciplinary action.  So I'd ask the Court not to do that in

Colloquy

1    this case.

2          THE COURT:  Very well.  And I'm concerned that that

3    would extend beyond what's necessary to protect -- or prevent

4    Mr. Elonis from engaging in similar type of conduct.  I would

5    agree with Mr. Bostic.  I think the Bureau of Prisons -- while

6    it has not been fully successful in the past, the Bureau of

7    Prisons, aware of these charges, aware of the past, will take

8    into account what liberties, what privileges that they extend

9    to Mr. Elonis.

10         I would hate to say he -- for them to say, well, he

11   can't get on a computer at all just -- and then put him in a

12   position where he's being unnecessarily denied certain

13   privileges that might otherwise be available to him.  So I'm

14   going to leave that in the discretion of the Bureau of Prisons.

15         Anything else from either counsel?

16         MR. O'HARA:  Not from the Government, Your Honor.

17   Thank you.

18         MR. BOSTIC:  Nothing from the defense, Your Honor.

19         THE COURT:  Okay.  Now, Mr. Elonis, you were convicted

20   by a jury and you have now been sentenced and you have the

21   right to appeal.  As you are aware, your first appeal is a

22   direct appeal.  That goes to the Third Circuit Court of

23   Appeals.  If you're not satisfied with the decision of the

24   Third Circuit Court of Appeals, you can ask the United States

25   Supreme Court to take a look at the Third Circuit's opinion.

escribers
www.escribers.net | 800-257-0885

Colloquy

1      Once that direct appeal is complete, you would have

2  the right to file a collateral appeal, which is often referred

3  to as a habeas corpus or a 2255 motion where you can file

4  collaterally your conviction and/or your sentence.

5      Any notice of appeal must be filed within fourteen

6  days of the entry of judgment or within fourteen days of the

7  filing of a notice of appeal by the Government.  If requested,

8  the clerk will prepare and file a notice of appeal on your

9  behalf.  If you cannot afford to pay the cost of an appeal or

10  for appellate counsel, you have the right to apply for leave to

11  file an appeal in forma pauperis, which means you can apply to

12  have the Court waive the filing fee.  On appeal you may also

13  apply for court-appointed counsel.

14      Now, I believe, Mr. Bostic, you will continue to

15  represent Mr. Elonis with respect to his appellate rights?

16      MR. BOSTIC:  Yes, Your Honor.

17      THE COURT:  Very well.

18      Counsel, anything further before we adjourn?

19      MR. O'HARA:  Not from the Government, Your Honor.

20  Thank you.

21      THE COURT:  Anything further?

22      MR. BOSTIC:  No, Your Honor.  Thank you.

23      THE COURT:  Very well.  This matter's adjourned.

24      THE CLERK:  All rise.

25    (Proceedings concluded at 3:55 o'clock, p.m.)

eScribers
www.escribers.net | 800-257-0885

```
1                    C E R T I F I C A T I O N

2

3          I, Carol Folk, court-approved transcriber, do hereby

4   certify the foregoing is a true and correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9                                           April 3, 2023
    Carol Folk
10  _____            _____

11  Carol Folk                          DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```